# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

**ANN FUNDERBURKE**, individually, )
and on behalf of those similarly situated, )
)
)
          Plaintiff, )
)
v. ) Case No. 12-2221-JAR/DJW
)
**MIDLAND FUNDING, L.L.C.,** )
)
          Defendant. )
)

## MEMORANDUM AND ORDER

This putative class action was originally filed in Wyandotte County, Kansas District Court. Plaintiff Ann Funderburke alleges that Defendant Midland Funding, LLC ("Midland") improperly obtained judgments against her and similarly situated others as the assignee of certain credit card debt. Plaintiff alleges that the judgment against her was improper because Midland was not licensed to collect supervised loans under Kansas law, and, therefore, the debt was unenforceable. Plaintiff further claims that Midland violated the Kansas Consumer Protection Act ("KCPA") by representing to Plaintiff that the debt was enforceable, and asserts state law tort claims for abuse of process and conversion. The case was removed on April 17, 2012, under the Class Action Fairness Act of 2005.[1]

Before the Court is Defendant's Motion to Compel Arbitration and to Stay Trial Court Proceedings (Doc. 17), in which Defendant relies on the arbitration clause in the debt contract upon which it previously obtained judgment. The motion is fully briefed, and the Court is prepared to rule. As discussed below, the Court grants Defendant's motion and stays this case

---

[1] Pub. L. 109-2; 119 Stat. 4.

pending arbitration.

**I.     Background**

Defendant presents the following facts in its motion to compel arbitration. Plaintiff opened a credit card account issued by Associates National Bank (Delaware) ("Associates"), on or about September 14, 2000. The Associates Account was governed by a cardmember agreement. The sample cardmember agreement states that it "governs your Account and use of the Card we have issued to you," and that "any use of the Card by you or an authorized user is your agreement to comply with the terms of this Agreement." Plaintiff used the Associates Account by making purchases on the Account after it was opened, and had stopped making payments on the Account by March 2007. The Account was charged off in July 2007.

The cardmember agreement contains an arbitration clause, which is prefaced by language in all capital letters, and states in relevant part as follows:

> ARBITRATION. THIS ARBITRATION PROVISION LIMITS YOUR RIGHT TO LITIGATE CLAIMS IN COURT AND YOUR RIGHT TO A JURY TRIAL. YOU SHOULD READ THIS PROVISION CAREFULLY. Any claim, dispute, or controversy (a 'Dispute') between you and us including without limitation those related to this Cardmember Agreement, your Account, goods or services purchased in whole or in part by use of your Account, or those relating to the validity, enforceability, or scope of this arbitration provision shall be resolved, upon the election of you or us, by binding arbitration pursuant to this arbitration provision and the Commercial Arbitration Rules and Procedures of the American Arbitration Association (AAA). This arbitration provision applies to any Dispute between you and any of our employees, our affiliate companies, and their employees.[2]

The arbitration clause further provided that it "is fully binding in the event a class action is filed"

---

[2]Doc. 18, Ex. A-6.

in which Plaintiff is either "a representative or member."

An anti-waiver clause also appears in the arbitration agreement:

> You and we agree that bringing a lawsuit, counterclaim, or other action shall not be deemed a waiver of the right to demand arbitration of any Dispute . . . by the other party. As an example, and not by way of limitation, if we file a lawsuit [against] you in court to collect a debt, and you file a counterclaim against us in that [lawsuit], we have the right to demand that the entire Dispute, including our original lawsuit [against] you and your counterclaim against us, be arbitrated in accordance with this arbitration provision. You and we agree that bringing the lawsuit shall not operate as a [waiver] of our right to demand arbitration.

The cardmember agreement further provided that Associates "may assign this Agreement or any of our rights under it without prior notice or your consent."

In or about January 2002, Associates was merged into Citibank (South Dakota), N.A. ("Citibank"), and Plaintiff's Account became a Citibank account thereafter. Under a May 28, 2008 Bill of Sale, Assignment and Assumption Agreement ("Bill of Sale"), Citibank sold and assigned the Associates Account, including all of Citibank's rights, title and interest thereto, to Midland. The purchase balance on the Associates Account at the time Midland acquired it was $644.35.

On December 17, 2008, Midland filed suit in Wyandotte County, Kansas, District Court against Plaintiff for recovery of the amount owed on the Associates Account, together with interest and costs. A Journal Entry of Judgment was entered in Midland's favor on April 15, 2009.

On March 16, 2012, Plaintiff filed her Petition in Wyandotte County, Kansas District Court, asserting four counts on behalf of herself and others similarly situated against Midland, arising out of the Associates Account and Midland's collection of the debt: (1) declaratory

judgment that Midland had no authority to collect Plaintiff's debt or enforce rights against Plaintiff or members of the putative class in Kansas and that judgments obtained prior to Midland obtaining a supervised lender license are void; (2) violation of the KCPA for misrepresenting to Plaintiff and members of the putative class that Midland had authority to collect the debt in Kansas; (3) abuse of process; and (4) conversion. Midland removed this action and now seeks to enforce the arbitration clause included in the cardmember agreement.

## II.     Legal Standards

While the interpretation of contracts—including arbitration agreements—is usually a matter of state law, the Federal Arbitration Act ("FAA") imposes certain rules beyond those normally found in state contract law.[3] The FAA applies to written arbitration agreements in any contract "evidencing a transaction involving commerce."[4] Congress designed the FAA "'to overrule the judiciary's long standing refusal to enforce agreements to arbitrate'"[5] and, by enacting the FAA, created "a liberal federal policy favoring arbitration agreements."[6] Under the FAA, a court should compel arbitration if it finds that (1) a valid arbitration agreement exists between the parties; and (2) the dispute before it falls within the scope of the agreement.[7]

But despite its liberal policy, the FAA does not "require parties to arbitrate when they

---

[3]*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1773 (2010) (citing *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 629–30 (2009); *Perry v. Thomas*, 482 U.S. 483, 493 n.9 (1987); *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)).

[4]9 U.S.C. § 2.

[5]*Volt Info. Scis., Inc.*, 489 U.S. at 478 (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219–20 (1985)).

[6]*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

[7]9 U.S.C. §§ 2–3.

4

have not agreed to do so."[8] Instead, it requires that courts enforce "agreements to arbitrate, like other contracts, in accordance with their terms."[9] So if a generally applicable state contract defense invalidates an arbitration agreement, or if grounds exist at law or equity that would call for the revocation of any contract, courts must not compel arbitration under the agreement.[10] Enforcing the agreement according to its terms "is fully consistent with the goals of the FAA, even if the result is that the arbitration is stayed where the Act would otherwise permit it to go forward" because by rigorously enforcing the agreement according to its terms, courts give "effect to the contractual rights and expectations of the parties, without doing violence to the policies behind the FAA."[11]

### III. Discussion

Plaintiff argues that the Court should not compel arbitration because (1) there is no valid arbitration agreement between these parties; (2) the arbitration agreement was illegal because Midland was not licensed as a supervised lender in Kansas at the time it filed the enforcement action; (3) Midland waived its right to arbitrate by filing the enforcement action in state court in 2008; and (4) Midland is judicially estopped from seeking to compel arbitration.

#### A. Authentication Objections

Plaintiff objects to the evidence submitted by Defendant in support of its motion to compel arbitration, so the Court addresses this issue first. Defendant submits the declaration of

---

[8] *Volt Info. Scis., Inc.*, 489 U.S. at 478.

[9] *Id.* (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)).

[10] *See id.*; *see also Perry v. Thomas*, 482 U.S. 483, 489 & 492–93 n.9 (1987).

[11] *Volt Info. Scis., Inc.*, 489 U.S. at 478.

Kyle Hannan, the Manager of Business Development Process for Midland Credit Management, Inc. It also submits the affidavit of Sabrina Stewart, a records custodian for Citibank. Hannan's declaration, attached to Defendant's motion as Exhibit A, purports to certify the authenticity of several exhibits, including the sample cardmember agreement that Midland contends applies to Plaintiff's credit account and contains the subject arbitration provision. Plaintiff argues that Hannan is not competent to testify about the sample cardmember agreement attached to his declaration because he did not work for Associates, the original creditor, at the time it was created. Plaintiff urges that Hannan's declaration does not establish that she is a party to the sample agreement because Hannan does not indicate a date on which it was sent to Plaintiff, or the address to which it was sent. Plaintiff further argues that Midland is unable to show the chain of title for Plaintiff's debt—that her debt was transferred from Associates to Citibank, and then assigned by Citibank to Midland.

Hannan attests that his declaration is made from his own personal knowledge, as well as from his review of Midland's business records and business records transferred to Midland in the ordinary course of business. In paragraph 2, he declares that some of the records were created by businesses other than Midland and that these were made by, or transmitted to Midland by "a person with knowledge of the events described therein, at or near the time of the event described," and that they qualify as business records.

In arguing that Hannan's declaration is insufficient to qualify the attached exhibits as business records, Plaintiff relies on *Webb v. Midland Credit Management, Inc.*,[12] a case in which the Northern District of Illinois considered a motion to compel arbitration brought by Midland

---

[12] No. 11 C 5111, 2012 WL 2022013 (N.D. Ill. May 31, 2012).

against a different debtor. The cardmember agreement in *Webb* had been assigned four times and the plaintiff defeated the motion to compel arbitration by establishing that the defendants were unable to show an unbroken chain of assignment that allowed them to stand in the shoes of the original assignor.[13] The plaintiff successfully argued that the defendants failed to lay the necessary foundation that the cardmember agreement and supporting documents were business records through the testimony of a qualified witness.[14] The witnesses did not have personal knowledge about the recordkeeping procedures for each of the assignee business entities that created the exhibits in support of the motion to compel arbitration.[15]

While this case does involve a merger between Associates and Citibank, unlike in *Webb*, it involves only one assignment. In *Webb*, Midland could not establish an unbroken chain of assignment, despite its submission of affidavits from records custodians for both Midland and Citibank, the original creditor in that case. Because there were three other intervening assignments, the court determined that these two records custodians could not establish that the documents originating with the intervening entities qualified as business records. In contrast, there are no intervening assignments in this case between Citibank and Midland. The evidence shows that Citibank directly assigned certain accounts to Midland, and Midland has submitted affidavits from records custodians for both of these entities that establish that the exhibits were prepared in the ordinary course of business by Citibank and transferred to Midland as part of the bill of sale.

---

[13]*Id.* at *5.

[14]*Id.* at *4–5.

[15]*Id.* at *5.

The Court finds that Hannan's declaration sufficiently lays a foundation for the exhibits attached thereto—he is an agent of Midland, he has reviewed Midland's business records and those of its predecessors in interest on Plaintiff's debt, and he has reviewed public records available on the Federal Deposit Insurance Corporation's ("FDIC") website. The exhibits attached to Hannan's declaration are admissible as business records pursuant to Fed. R. Evid. 902 and 803(6). Moreover, Sabrina Stewart's affidavit, attached to Defendant's motion as Exhibit A-4, provides the necessary foundation for Citibank's records. She attests that she is a records custodian and that they are kept in the regular course of business. The Court finds that Hannan and Stewart sufficiently authenticate the documents attached to Midland's motion to compel arbitration.

B. **Parties to the Arbitration Agreement**

The Court must first determine if the parties agreed to arbitrate this dispute by applying the "federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act."[16] Plaintiff argues that there is insufficient proof that she is bound by the sample cardmember agreement attached to Midland's motion because there is no evidence that she signed it, or that it was sent to her along with her credit card. She argues that the Hannan declaration is insufficient because he lacks personal knowledge about whether the sample agreement was actually sent to her in 2000 by Associates. But as the Court explained in ruling on Plaintiff's evidentiary objection to this evidence, Hannan need not have personal knowledge that the sample cardmember agreement was actually sent to Plaintiff in 2000 in order to show

---

[16]*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (quotation omitted).

8

that Plaintiff is a party to the agreement. Instead, Hannan testified as a custodian of records for Midland, the assignee of Citibank, which merged with Associates in 2002. He submitted supporting documentation of the Citibank merger from the FDIC website, which are public records. And he submitted the abstract of Plaintiff's account information from the Excel file showing accounts that were assigned by Citibank to Midland pursuant to the 2008 bill of sale. His declaration certifies that these documents are business records, which makes them self-authenticating under Rule 902.

Moreover, Plaintiff is incorrect that Midland must produce a signed copy of the agreement, or some proof that it was in fact sent to her, in order to establish its validity. "Evidence of a cardholder's use of the card is sufficient to prove the existence of an agreement."[17] Midland submits Plaintiff's credit card statements through the Hannan and Stewart affidavits, showing that she used her Citibank card and accumulated debt. In fact, Plaintiff does not dispute that she was issued and used the card. The terms of the cardmember agreement submitted by Midland provide that any use of the card constitutes an agreement by her to comply with the terms of the agreement. Plaintiff's use of the card represented her acceptance of the terms of the agreement, including the arbitration provision.[18] She is bound by its terms.

Plaintiff next argues that there is no valid agreement to arbitrate because Midland is not a party to the sample cardmember agreement. Plaintiff claims that Midland is not an "affiliated

---

[17]*Citibank (South Dakota), N.A. v. Gumb*, 180 P.3d 623 (table), 2008 WL 1722286, at *3 (Kan. Ct. App. Apr. 11, 2008).

[18]*See Grasso v. First USA Bank*, 713 A.2d 304, 309 (Del. Super. 1998); *Gumb*, 2008 WL 1722286, at *3.

9

company" as contemplated by the agreement, and that the bill of sale is insufficient evidence that it was assigned Plaintiff's debt. The Court has already determined that the evidence submitted by Midland is admissible. In addition to the bill of sale evidencing the assignment, Hannan also submits an abstract from a voluminous Excel file of the data pertaining to Plaintiff's Associates Account.[19] Hannan states that the Excel file was included in the electronic records on charged off accounts that Citibank transferred to Midland as part of the sale. The Court further finds that this evidence shows that Plaintiff's debt was included in the assignment to Midland.

The cardmember agreement includes an assignment clause, providing that Associates, later merged with Citibank, "may assign this Agreement or any of our rights under it without prior notice or your consent."[20] While Plaintiff is correct that the arbitration provision states that it applies to any claim, dispute, or controversy between "you and us," or any of Associates' "employees," "affiliate companies, or their employees," since Midland is an assignee, it steps into the shoes of Citibank and, thus, may enforce the rights set forth in the agreement, including the right to submit a dispute to arbitration.[21]

Having determined that these parties entered into an agreement to arbitrate as set forth in Exhibit A-6, the Court proceeds to determine whether this dispute falls within the scope of that agreement.

### B. Scope of the Agreement—Illegality Defense

---

[19]Doc. 18, Ex. A-2.

[20]Doc. 18, Ex. A-6.

[21]*See Creekstone Farms Premium Beef, LLC v. Suitt Constr. Co.*, No. 04-1052-JTM, 2007 WL 2155659, at *5 (D. Kan. July 25, 2007).

10

The agreement provides that

> [a]ny claim, dispute, or controversy . . . between you and us including without limitation those related to this Cardmember Agreement, Your Account, goods or services purchased in whole or part by use of your Account, or those relating to the validity, enforceability, or scope of the arbitration provision shall be resolved, upon the election of you or us by binding arbitration . . . .

The controversy at issue here involves Midland's enforcement of Plaintiff's credit card debt in the state court action. Midland argues that the scope of the arbitration agreement includes the claims asserted by Plaintiff in this case, as well as her illegality defense that Midland was not licensed to enforce Plaintiff's debt. Because these arguments go to the enforceability of the cardmember agreement in general, and the arbitration provision in particular, Midland urges they should be decided by the arbitrator and not by the Court.

Generally, the "question of arbitrability"—whether the parties have submitted the dispute to arbitration—is for the Court to decide.[22] But parties may agree to arbitrate "gateway issues" of arbitrability "such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."[23] Here, Midland seeks to enforce the provision within the subject arbitration agreement delegating questions of enforceability to the arbitrator. Plaintiff does not respond to this argument, nor does she challenge the enforceability of the delegation provision. Therefore, the Court "must treat it as valid under § 2 [of the FAA], and enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the

---

[22] *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).

[23] *Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2777 (2010).

arbitrator."[24] The question as to whether the arbitration agreement covers this dispute, based on the contract defense of illegality, is properly before the arbitrator. Moreover, Plaintiff's illegality defense goes to the enforceability of the cardmember agreement as a whole, not just the arbitration provision. Under the rule in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, the arbitrator must decide this issue.[25]

### C. Waiver

Next, Plaintiff argues that Midland waived its right to arbitration by using the judicial process to obtain state court judgments against her and others similarly situated. The delegation provision does not clearly cover this dispute, so the Court must resolve the waiver issue before it may compel arbitration.

There is no set rule for what constitutes waiver of the right to arbitrate a dispute—it depends on the facts and circumstances of each case.[26] The Tenth Circuit has formulated the following factors for the Court to consider in determining whether a party waived its right to arbitration:

> "(1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) whether important intervening steps [e.g., taking advantage of

---

[24]*Id.* at 2779.

[25]388 U.S. 395, 403–04 (1967).

[26]*Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 772 (10th Cir. 2010).

> judicial discovery procedures not available in arbitration] had taken place; and (6) whether the delay affected, misled, or prejudiced the opposing party."[27]

It is Plaintiff's burden to show that Midland has waived its right to demand arbitration.[28] In deciding whether this burden has been met, the Court must give "substantial weight to the 'strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration.'"[29]

Midland argues that the language of the arbitration provision itself controls the issue of waiver in this case because it allows the parties to choose the disputes for which they will demand arbitration, and because it allows a party to demand arbitration of a claim even after initially asserting a different claim for relief in court. The Court assumes without deciding that the Tenth Circuit would follow the lead of the Second, Third, and Sixth Circuits in holding that a "no waiver" provision in an arbitration agreement does not alter the Court's analysis of the so-called "*Peterson* factors," in determining whether the right to arbitration was waived.[30] Therefore, the Court proceeds to consider those factors in determining the issue.

Under the first and second *Peterson* factors, Plaintiff argues that Midland's election to obtain a judgment on this contract is inconsistent with its decision in this case to demand arbitration. Plaintiff maintains that this action is a collateral attack on that judgment, therefore it

---

[27]*Id.* at 772–73 (quoting *Peterson v. Shearson/Am. Express, Inc.*, 849 F.2d 464, 467–68 (10th Cir. 1988)).

[28]*Id.* at 775.

[29]*Id.* (quoting *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1488 (10th Cir. 1994)).

[30]*See S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 86 (2d Cir. 1998); *Gray Holdco, Inc. v. Cassady*, 654 F.3d 444, 452 (3d Cir. 2011); *Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 717 (6th Cir. 2012).

is properly determined through the judicial process. Midland counters that the judgment on Plaintiff's credit card debt was a separate action that did not involve the claims asserted in this case—whether Midland was authorized to enforce its debts in Kansas, violation of the KCPA, abuse of process, and conversion. Because these specific claims were not litigated in the prior action, Midland urges that its actions in obtaining that judgment cannot constitute waiver.

The Court agrees that Midland's prior litigation enforcing the debt against Plaintiff fails to establish waiver in this case. That case merely obtained judgment on a debt—default judgment. Plaintiff did not appear nor file a counterclaim or defense in that action. The specific claims at issue in this case were not litigated in that action and so Midland's litigation enforcing Plaintiff's debt does not support a finding of waiver here.[31]

Confining the analysis to Midland's conduct in this litigation, Plaintiff falls short of her burden to demonstrate waiver. Plaintiff filed her Petition on March 16, 2012. Midland promptly removed the case and filed an Answer on April 24, 2012, asserting the right to elect mandatory, binding arbitration as an affirmative defense. Plaintiff then filed a motion to remand, which she eventually withdrew. Prior to Plaintiff withdrawing the motion to remand, however, Midland notified her of its intent to elect that the matter be submitted to arbitration. Midland sent this notice less than two months after removal and before a scheduling order could be entered setting discovery and other deadlines. Upon being advised that Plaintiff would not agree to arbitration,

---

[31]*Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 133 (2d Cir. 1997) ("[O]nly prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in waiver of the right to arbitrate."); *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 328 (5th Cir. 1999) (same); *MicroStrategy, Inc. v. Lauricia*, 268 F.3d 244, 250 (4th Cir. 2001) (same).

Midland filed the instant motion on August 3, 2012.[32] The Court finds no evidence under these facts that Midland willingly participated in the judicial process other than to remove the case and move to compel arbitration.[33] The Court finds no inconsistencies between Midland's conduct in this litigation, and its assertion of the right to arbitrate. Likewise, the Court does not find that the parties had engaged in significant litigation—there was no motions practice other than Plaintiff's motion to remand filed prior to Midland demanding arbitration. Midland did not file a dispositive motion or engage in discovery.

Plaintiff argues that an "important intervening step" has occurred in this litigation because Midland obtained a judgment that cannot be "undone" by an arbitrator. She further argues that she would be prejudiced by submitting the declaratory judgment claim to arbitration because the Court "certainly would grant an objection made by Midland that the arbitrator exceeded his authority." But Plaintiff cites no authority for this proposition. As with any other arbitration award, the decision of the arbitrator may be submitted to the Court for confirmation and this Court's review of that award would be quite limited.[34]

The Court has considered the *Peterson* factors as applied to the facts and circumstances of this case. The Court finds that Plaintiff fails to meet her burden of showing waiver of the

---

[32] The briefing on this matter was stayed for several months in order for the Court to resolve another motion initiated by Plaintiff, for discovery related to this motion. It did not go under advisement until November 13, 2012.

[33] *See Robinson v. Food Serv. of Belton, Inc.*, 415 F. Supp. 2d 1221, 1225–26 (D. Kan. 2005) (finding waiver where non-moving party had taken depositions, engaged in discovery, and participated in other judicial procedures before filing motion to compel); *Morvant v. P.F. Chang's China Bistro, Inc.*, 870 F. Supp. 2d 831, 846 (N.D. Cal. 2012) ("removal prior to compelling arbitration is neither uncommon nor inconsistent with the right to arbitrate.").

[34] 9 U.S.C. § 9; *see Denver & Rio Grande W. R.R. Co. v. Union Pac. R.R. Co.*, 119 F.3d 847, 849 (10th Cir. 1997). The Court declines to rule on the question of whether Plaintiff's declaratory judgment claim is a claim unto itself, or simply a predicate to her other claims, as Midland argues. That question is for the arbitrator.

right to arbitrate this dispute.

**D.  Judicial Estoppel**

Finally, Plaintiff asks the Court to apply the doctrine of judicial estoppel and bar Midland from invoking the arbitration clause in this case.  Judicial estoppel is an equitable doctrine, which protects "'the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'"[35]  As an equitable doctrine, the Court must consider all of the equities of the case.[36]  As a result, the circumstances under which a court might invoke judicial estoppel will vary.[37]  But typically, three factors "inform the decision whether to apply the doctrine in a particular case."[38]  First, a party's later position must be clearly inconsistent with its previous position.[39]  Second, a court should determine whether the party "succeeded in persuading a court to accept that party's former position, 'so that judicial acceptance of an inconsistent position in a later proceeding would create the *perception* that either the first or the second court was misled.'"[40]  Third, the court should determine whether the party "would gain an unfair advantage in the litigation if not estopped."[41]  While these factors may inform the Court's decision, they are not "inflexible prerequisites or an exhaustive formula

---

[35]*Eastman v. Union Pac. R.R.*, 493 F.3d 1151, 1156 (10th Cir. 2007).

[36]*See New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001).

[37]*Id.*

[38]*Eastman*, 493 F.3d at 1156.

[39]*Id.*

[40]*Id.* (quoting *New Hampshire,* 532 U.S. at 750).

[41]*Id.*

16

for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts."[42] Judicial estoppel should be applied "both narrowly and cautiously."[43]

The Court declines to apply judicial estoppel in this matter. Plaintiff makes many of the same arguments in advocating application of judicial estoppel as she does in arguing that Midland waived its right to compel arbitration. The Court has already disposed of these arguments. Most importantly, Plaintiff fails to establish that Midland affirmatively sought to avoid arbitration in the first case in which it obtained a default judgment against her. And, as discussed on the waiver issue, the claims are not the same. Midland made the decision to seek a default judgment against Plaintiff in the enforcement action, an action that apparently did not involve either party seeking to compel arbitration. There were no claims in that case under the KCPA, or for abuse of process and conversion. Therefore, Midland's position in the two cases are not in direct conflict. Midland did not convince the state court in the prior action to accept a position that is inconsistent with its motion to compel arbitration in this case. Under the circumstances of this case, judicial estoppel does not apply.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Compel Arbitration and to Stay Trial Court Proceedings (Doc. 17) is **granted**. The Court stays all proceedings and orders the parties to proceed to arbitration. Midland shall file a status report by June 30, 2013, advising whether this matter has been resolved or whether arbitration is still pending.

---

[42] *New Hampshire,* 532 U.S. at 751.

[43] *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1227 (10th Cir. 2011) (quotation omitted).

Dated: February 1, 2013

 S/ Julie A. Robinson

JULIE A. ROBINSON

UNITED STATES DISTRICT JUDGE